Constantine Robestoff Appearing on behalf of the Appellant, Kara Burke This involves an ERISA plan, and I happened to be before this Court, not because my client was determined not to have met the definition of disability under the ERISA plan, but because she failed to attend a second medical examination, which was a post-appeal examination, by the same doctor that the disability department had used to deny her benefits in the first instance. However, before I get to some of the facts, I'd like to address the Court's question in this case, that is, what effect, if any, does Abbotty v. Alta Health & Life Insurance Company have on this appeal? I think the answer to this question is that it has quite an effect, because I think the district court in this case erred under the principles that this Court established in Abbotty, and specifically the analysis that's contained on page 973 through 974 of the Abbotty decision. First, the district court failed to examine the nature, extent, and effect on the decision-making process of Pitney Bowes in this case. Conflict of interest in assessing whether or not Pitney Bowes abused his discretion. Now, Judge Patel's order, which appears on the supplemental excerpts of record, tab 6, the order dated August 8, 2005, leaves no doubt that in her analysis she applied the Atwood criteria. Now, I'm not faulting Judge Patel for applying the Atwood criteria, just as like this Court did not fault the district court in Abbotty for applying that criteria, because that's the law that was in effect at that time. On timing, this Abbotty came down after you filed your first briefs in this Court. Is that correct? That's correct. Okay. And it's clear that Judge Patel used Abbotty several times to dismiss the appellant's argument that the conflict of interest should enable the judge to give less deferential review. Now, Judge Patel in this case says, no, I'm going to use the abuse of discretion standard of review, and I'm basing that decision, at least in part, on the rationale in Atwood. Counsel Abbotty notwithstanding, what is there in the plan documents that would preclude a second examination? Judge Patel in this case concluded that Section 5D of the plan, and Section 5 is under the category of claims processing, that under Section 5D of the plan, the committee had the right during the appellate process to order a second examination by the same doctor that the disability department used to deny the benefits in the first instance. So what's wrong with that? Well, because if you look at Section 7 of the plan, Section 7 deals with the appeal. In other words, after the benefits have been terminated under Section 5, then you have to look at Section 7 on the appeal side of it as to what the committee can do or should do in evaluating whether or not the disability department made a mistake. That doesn't mean that the rest of the plan disappears just because you're in the appeal process, though. No. It doesn't mean the rest of the plan disappears. But if you look at Section 5, it says 5D, it says that the disability department has the right to request a reasonable medical examination. We don't question that, because when the first time that Ms. Burke was sent to be examined by Dr. Berry, it was under Section 5D. So that was a reasonable request, and she was examined. Based on the examination of Dr. Berry, who found that she could go back to light duty, the disability department said, well, in light of Dr. Berry's finding, we're terminating your benefits. Now, first of all, that was an improper termination under the plan itself, because Dr. Berry never opined that even if she could go back to light duty, she could earn at least 60 percent of her predisability earnings, which is a second condition that's required under the plan. Now, after the disability benefits are terminated, then under Section 7, there are certain requirements that Ms. Burke had to do, which she did. She appealed, and as required under Section 7, she produced documents to refute the initial termination. And those documents were the report of Dr. Swearen and the report of the work specialist, who both concluded that, no, she's disabled under the plan. Now, after Do you have a case that says that the plan or the administrator or the employer is precluded from requiring subsequent physical examinations once the claim process is into the appeal stage? I'll answer the question in two ways. I believe the Dishman case. Dishman? Dishman addressed that very same issue, because that's what happened in Dishman. Unum terminated benefits and then said to the plaintiff, you're going to have to do this and provide further information in order to prove that our termination was wrong. And Dishman says that, as the Court did in this case, put things in reverse. You can't terminate benefits and then on the appeal process tell the plaintiff, well, we're going to uphold that termination because you haven't proved that the second examination would have proved something different. What's the specific language in Dishman that you're relying upon to support your argument that the plan did not authorize the requirement of a second examination? Well, I'm looking at page 19 of my initial brief. I'm asking you the language in Dishman that supports your argument. The language, quote, is on page 986 of the Dishman decision, which is 269, Fed 3rd, 974. And they referred to the claims person. The name was Puthoff. It says, Puthoff did not suspend Dishman's benefits after Dishman refused to provide information. Rather, she terminated his benefits first and then indicated a willingness to consider any clarification. I'm looking at page 986 of the opinion. Yes, Dishman. Okay. All right. And that's what happened here. I mean, if you look at section 5, it says that the plan has the right to suspend or discontinue benefits if she doesn't appear at the medical examination. If you look further on that page, it says Dishman cooperated up to July 18, 1995, the day Puthoff called to deliver the bad news. Indeed, it was she, not he, who canceled the IME. So it appears there was an IME scheduled for Dishman, which would indicate that subsequent medical examinations are not precluded. Well, my understanding on Dishman, that was the first, quote, IME, which is different in our case because they already had Ms. Burke examined by Dr. Berry, and they used his examination to terminate her benefits in section 5. But specifically, if you look at section 7 of the plan, section 7 specifically states that when the committee looks at the appeal, they have to look at it objectively and not be adversaries. They have to look at whether the disability department ruled correctly. Now, rather than doing that, they said, we want you to be examined by the very same doctor who the department used to terminate your disability benefits. I think under section 7, that's a violation of that section. Well, now, section 7 makes it clear that you have to have different decision-makers. You can't have the people who reviewed it and denied it. But does it go on to specify who's required, who you could have them examined by? Well, here they used Dr. Berry as a consultant to review the records. Yes. I think that's a violation of section 7, because you're asking the same doctor who initially found her not disabled to review the records on appeal. Okay. But I think also what I'd like to focus on is that the Court never did a factual finding as to why this was a reasonable request. Because I think because once the Court found it was an abuse of discretion, they said, well, if the committee requested it, it's reasonable. They never looked at the fact that the committee determined that even if she would have been examined by Dr. Berry the second time, it would have made no difference in their decision. Dr. Berry had no input on whether she could work and earn 60 percent of her predisability earnings. So even if the second examination had taken place, it would have added absolutely nothing to the mix. So here, I think under ERISA, it's a statute of equity. It's criminal to deny the woman benefits because she didn't attend some medical examination that wouldn't have produced any evidence on the ultimate issue as to whether she was disabled under the policy. Counsel, the difficulty is the plan administration would be chaotic if the employees can decide when to attend medical examinations. But don't forget, she did attend two. And the factual capacity examination, she attended when they asked her to. I understand. I understand. But to put it in the hands of the employee to decide when medical examinations are necessary would be a little disruptive, it would appear. But you've exceeded your time, but we'll give you one minute for rebuttal. Counsel, let us ask you the question, how does ABATI affect this case, and should it be remanded for the court to reconsider this case under the principles articulated in ABATI? Under the unusual facts of this case, ABATI does not change the district court's analysis. First of all, the discretionary language analysis is unchanged by ABATI, so I won't go into the plan's discretionary terms unless the court has any questions on that in the interest of saving time. ABATI impacts the application of the abuse of discretion standard in two circumstances. One is where there's a conflict of interest, where there's a fiduciary. Can you wait just a minute? Let the world go by. Can I get my extra ten seconds back? Where a conflicted fiduciary. ABATI discusses two changes to the standard of the application of the abuse of discretion standard of review. Conflicted fiduciaries is one. The district court reviewed the conflicts that plaintiff had asserted and found that the procedural violations plaintiff asserted did not amount to conflicts of interest. You don't think that would be affected by anything in ABATI which says you get a little skeptical and look a little harder? Well, I don't, because one issue that the district court did not address is that the committee cannot, by the structure of this plan, be a conflicted fiduciary. This plan's assets are held in a trust that's qualified as a Voluntary Employee Benefits Association, or a VBA trust. That's under the Internal Revenue Code Section 501C9 and the accompanying regulations. That section of the Internal Revenue Code imposes strict requirements on the use of trust fund assets. This is not a self-funded plan or an insurance policy plan. Rather, this is a plan where the employees and the employer provides contributions on a regular basis sufficient to fund the benefits. And so the plan's assets cannot inure back to the benefit of the employer under ERISA and the Internal Revenue Code. Is this all in the record? Yes, it is, Your Honor. The excerpts of the record at page 40 is the plan documentation relating to the structure of the plan's trust fund, and the excerpts of the record at page 70 is the discussion of that in the summary plan description provided to employees. Counsel, just as kind of real-world practical, would there have been any difference if Dr. Berry had examined her again? What he did was to take the reports of the other doctors and said, well, that doesn't change my mind. And so what would have happened if he'd done another physical? I think the phrasing of that very question illustrates the speculation with which one would need to answer it. Well, I'm just asking real-world. I'm not commenting at the moment on the procedural problem. Whether or not he would have changed his opinion is unclear. What is clear is that his opinion was negative in the first instance. Yes. So by Pitney Bowes asking him to review the claimant a second time, they were trying to ensure a full and fair review that the most negative piece of evidence in the record for this claimant should stand. The claimant had submitted several different pieces of evidence that she thought supported her claim. Pitney Bowes wanted the doctor who didn't think that she was disabled to review that evidence. But he had the full reports from the other doctors, and he just disagreed with him. He'd done his examination. There's no suggestion that her condition had changed for the better. Well, she had been participating in rehabilitative therapy, which is in the record. Presumably that works from time to time. I guess a more general way of asking Judge Fletcher's question is, you know, when there's this kind of a, I'll call it a procedural violation, does the plan have to show prejudice if they base the denial of benefits on the violation of a procedural violation? No, it does not. Can you cite a case for that proposition? Yes, I can. Parker v. Bank of America shows that a plan's terms will be enforced regardless of a showing of prejudice, that benefits should not be paid under a plan if it is directly contrary to the terms of the plan. And here there has been no showing of there is no need for the committee to show prejudice. What the plan clearly requires is that participants cooperate in the disability process. It would certainly be chaotic if participants got to choose when to attend IMEs and when not to, and it would go against the goals of ERISA, which are to safeguard plan assets for the benefits that are being promised. This plan clearly provides provisions that employees need to comply by in order to receive the benefits. One is cooperating. And the interesting thing, going back to the Abatey decision, which the court had wanted me to address, is that there was a new reason at the final appeal to deny the claim that wasn't present at the, or at least was not discerned at the initial level. Here the failure to attend an IME was specifically pointed out to Ms. Burke's counsel twice, that that failure to attend the IME would result in a procedural reason that alone was sufficient to terminate benefits. Despite receiving two letters from counsel, including specific plan citations, as to the provisions that would allow the committee to discontinue benefits solely on the basis of the refusal to attend the IME, she nonetheless steadfastly refused to attend. So here we have a participant who is explicitly warned of the ramifications of that conduct and flagrantly disregarded her obligations under the plan. Counsel, we have been furnished a video. This was of the functional whatever examination. Functional capacity evaluation, yes. Should we look at that? If Your Honor feels it would be helpful, I have looked at it. I do not believe that it supports Ms. Burke's claim. But it's certainly in the record. It was in the record as compiled by Pitney Bowes, which includes everything that was considered, generated, or submitted during the review process, and that was before the Employee Benefits Committee at the time it made its decision. If we were to determine that the 60 percent earnings thing had not been met, how does that fit into your analysis? I think that the district court's holding with respect to the earnings capacity violates McKenzie v. General Telephone Company, a 1994 decision issued by the Ninth Circuit. In that case, the Ninth Circuit explicitly rejected the notion that a plan administrator must obtain a vocational assessment in order to afford a claimant a full and fair review. Must obtain what? A vocational assessment in order to afford a claimant a full and fair review. It held that if an administrative record contained substantial evidence that the claimant's condition does not significantly impair his or her ability to work. But how do you get to the 60 percent? That's the problem. There's nothing in the record to support the 60 percent specific residual capacity. In the record there's evidence that Ms. Burke has a college degree. There's evidence of what her past job skills are. And so the question is, are we going to require employee benefit plans to obtain a vocational assessment for an earnings threshold of $30,000? This is not a $250,000 threshold that we're trying to meet. It's $30,000 from a resident in the Bay Area with a college degree. There has to be some showing that the 60 percent capacity is met, not just an inference because she has a college degree that she can get a job that pays that much. I think there has to be something in the record to support that. Respectfully, Your Honor, in McKenzie the showing was that a 52-year-old college-educated person who had a medical record that established that he could sustain light-duty work was sufficient. But light-duty work is a different finding than how much money you can make. But that was there was a specific earnings threshold in McKenzie. That was the issue before the court there, was whether or not the earnings threshold had been met. But it was similar to this plan where there was an earnings threshold. What finding did Judge Patel make on that? Judge Patel found that there was insufficient evidence on this point. Now, how do we judge that? Clearly erroneous? That would be, I would consider that a mixed question of fact and law. And so to the extent that there is factual issues, it would be clearly erroneous. But to the extent you look at that de novo, I doubt that. It's a really factual part of it. Or abuse of discretion at the most. Right. But if you look at cases such as Donovan v. Cunningham, that's a case out of the Fifth Circuit, that recognizes that fiduciaries can take into consideration the knowledge that's gained in their capacity as managers of a company. The record here shows that the head of HR of Pitney Bowes sat on this committee. Certainly that person has enough knowledge to actually be an expert in vocational assessment. She places companies world ñ she places candidates worldwide in her capacity as HR director for a multinational corporation. So you're telling us that Judge Patel was clearly erroneous in effect. I think that's what you're saying. Yes, that is our position, Your Honor. Counsel, let me just ñ in McKinsey, the distinction was made that what was being considered was the any occupation standard, not a specific earnings amount. It said whether or not the McKinsey could engage in any occupation, which is a little different than the discrete inquiry here where there's a 60 percent earning capacity issue. I agree that is different. My recollection of the case, if I'm not mistaken, is that it was both, that there was a switch to earnings ñ there was a switch to the any occupation standard from the own occupation standard and also whether or not there was a threshold income that had been met. Counsel, let me ask you this final question. What do we do with the fact that the district court judge used the Atwood standard in making her ruling? Does that require remand for the district court to apply the Abati standard? Because here there's no possibility of a conflicted fiduciary because of the structure of the plan and its assets being held in trust, I don't believe that the application of Atwood was dispositive because there's an independent basis for finding that there's a non-conflicted fiduciary under this structure. All right. Thank you, Counsel. Thank you. Rebuttal. Thank you. I know I don't have much time, but let me just say I think the catch word here is reasonable because she did not fail to cooperate. She went to an examination. She went to a functional capacity examination 8 months after all this. And right before the committee was going to meet in September, they said we want you to go to a second examination before Dr. Barry in August. She did not fail to cooperate. We have to look at reasonable. Now, there's not speculation that Dr. Barry's examination would have done nothing because the committee itself says nothing had changed. The committee itself said that they wanted to have Dr. Barry examine her just because it was an old examination. It had nothing to do with whether she could earn 60 percent of her predisability earnings at the time that she was denied her benefits. So I think, Your Honors, I would request you that the reasonable has to be. We have to look at the real world, not just this is ERISA. This is equity. And this is I feel an injustice has been done by denying this lady benefits on a mere technicality which has no basis or with no input on the eventual outcome as to whether or not she's entitled benefits under the policy. All right. Thank you, counsel. Thank you to both counsel. The case just argued is submitted for decision by the court.
judges: Fletcher, Tashima, Rawlinson